OPINION OF THE COURT
Kerry R. Trainor, J.
On February 2, 1999, David Wy. filed a verified petition seek *229 ing an order of this court vacating an order of filiation entered upon his admission. On May 15, 1991, he had appeared before Hearing Examiner Buse and admitted that he was the biological father of George W.-Wy., who was born out of wedlock to Barbara Ann W. on January 25, 1988. In support of his present application, Mr. Wy. asserts that “he has obtained a DNA test to exclude him as the father.”
After answering papers were filed by the child’s assigned Law Guardian and the County Attorney on behalf of Barbara W. and the Suffolk County Department of Social Services (hereinafter referred to as DSS), the issue of the admissibility and weight to be given to this privately arranged DNA paternity test was placed squarely before the court.
Background
The DNA test which is the driving force behind this litigation was performed under unusual circumstances. In early January of 1999, Mr. Wy. telephoned a nationally syndicated television talk show called “The Sally Jesse Raphael Show”; he offered to provide a DNA sample and appear as a guest to argue that he was not George W.-Wy.’s father. A representative of the show then telephoned Ms. W. She was equally convinced that DNA results would show that David Wy. was the father; she agreed to provide samples of her own and George’s DNA. Ms. W.’s decision was a necessary foundation for the upcoming show and eventually for this litigation.
Samples were collected and comparison testing was promptly completed by Micro-Diagnostics, Inc. (Micro-Diagnostics) of Nashville, Tennessee, in time for the videotaping of the show on January 13, 1999. Mr. Wy. appeared at the studio; Ms. W. testified that she did not appear because her son said he would be embarrassed if she did. Therefore, there was no guest to argue against Mr. Wy. He acknowledged that he had avoided paying over $28,000 in child support that was due to DSS in compensation for that agency’s support of Ms. W. and George. He told the audience that he supported his wife and legitimate children, and would support George if he were the father. In a mocking manner, he described George as having an appearance that was totally different from himself, the mother, or any member of either of their families. He confidently stated he was not the father. His position was supported by Mr. Alan Gelb, the show’s “paternity expert.” When the show’s host asked Mr. Gelb what Mr. Wy. should say to the Judge, Mr. *230 Gelb responded, “Tell the Judge you are not the father.” The crowd cheered.
A hearing has now been conducted. In the more challenging atmosphere of the courtroom, facts were presented that might have tempered the audience’s enthusiastic support for Mr. Wy.’s apparent victory. A photograph of George W.-Wy. has been placed in evidence. It clearly shows that David Wy.’s description of him on television has no relationship to his true appearance. George is an 11-year-old boy whose appearance is consistent with both his mother and Mr. Wy. There is no laughable dissimilarity. Mr. Wy. also acknowledged in court that he did have relations with Barbara Ann W. on at least five occasions during a time period when conception could have occurred. If he is not the father the only reason is chance. There is nothing about the boy’s appearance or the true history of the relationship with Ms. W. that casts any doubt on the accuracy of Mr. Wy.’s 1991 sworn admission that he is George’s father. In essence, after hearing this testimony, all that remains to support his application to undo paternity is the Micro-Diagnostics “certified” test report which states, “David Wy. cannot be the father of the child, George D. W.-Wy.”
When Mr. Gelb stated his opinion on television, he officiously referred to a document that he held in his hand. In this courtroom proceeding, efforts were made to support his opinion with a document entitled, “Affidavit * * * Certification Pursuant to CPLR § 4518 (d) and (e).” It was sworn to by Dr. Deborah Cutter, Ph D, the Director of Micro-Diagnostics, on January 13, 1999, which was the date of the videotaping of the show. It states, among other things, that her laboratory is certified by the State of New York to do paternity testing. It goes on to certify the accuracy of the test result that eliminates David Wy. as George W.-Wy.’s father.
Mr. Wy.’s attorney has offered this certification and the attached result into evidence pursuant to the “automatic” admissibility rules stated in CPLR 4518 (d) and (e) and Family Court Act § 532. The County Attorney opposes its consideration by the court. All parties agree that this laboratory is one of a limited number that are approved for this type of testing by the New York State Department of Health (hereinafter referred to as DOH). Additionally, they agree that there is no statutory bar to the consideration of the test results on account of res judicata, the presumption of legitimacy or equitable estoppel. These barriers, which are set forth in Family Court Act § 532, protect children from the emotional havoc of inappropriate *231 court-ordered paternity tests in certain circumstances. Since Mr. Wy. and Ms. W. were never married, there is no presumption of legitimacy. Even though they live in the same neighborhood and George bears David’s last name, all parties agree that George W.-Wy. has never developed a relationship with David Wy.; therefore, there is no estoppel issue. In light of Ms. W. reopening the paternity issue by providing DNA samples, no one has raised res judicata.
The County Attorney, however, correctly pointed out that the laboratory director’s “certification” was invalid for “automatic” admissibility because the test was not court ordered. The County further contended that it was prepared solely for a television show and was nothing more than a stage prop.
The County argued that these defects should end this litigation. The respondent’s attorney responded that the lack of a court order was merely a “technical defect” and asked to be permitted to prove the correctness of the test result stated in the certification. This request was granted. A hearing has been conducted because of the serious effect this document has had in revitalizing the paternity dispute and a sense that it was worthy of some judicial consideration because it was prepared by a DOH-authorized laboratory.
At the outset, Mr. Wy.’s counsel was instructed that the result stated in this particular certification would not be automatically accepted into evidence. He would have to call witnesses to explain the procedures that were followed in order to demonstrate by clear and convincing evidence what, if any, evidentiary value should be given to this particular DNA test. Because of the dilemma of having to deal with a questionable document that contains potentially significant results, this court has adopted, for purposes of this case, a standard suggested by Chief Judge Kaye in her concurring opinion in People v Wesley (83 NY2d 417, 445-446 [1994]):
‘While the general acceptability of these [DNA] techniques is no longer an open question, and trial courts may take judicial notice of their reliability, the adequacy of the methods used to acquire and analyze samples must be resolved case by case * * *
“ ‘[florensic DNA analysis should be governed by the highest standards of scientific rigor in analysis and interpretation. Such high standards are appropriate for two reasons: the probative power of DNA typing can be so great that it can outweigh all other evidence in a trial; and the procedures for *232 DNA typing are complex, and judges and juries cannot properly weigh and evaluate conclusions based on differing standards of rigor.’ ” (Citing National Research Council, DNA Technology in Forensic Science § 2.1 [1994].)
New York State DNA Testing Regulations and Safeguards
In paternity proceedings in which genetic marker or DNA testing is conducted pursuant to a court order (see, Family Ct Act §§ 418, 532), the process of admissibility presumes compliance with the numerous requirements and standards set forth in Public Health Law article V and the regulations enacted thereupon. (See, 10 NYCRR subpart 58-1; DOH Wadsworth Center, Paternity/Identity Testing Standards, published on the Internet at http://www.wadsworth.org/labcert/document.pdf.) Admissibility is a given so long as the test was properly ordered by the court, performed by an authorized laboratory, and documented on a CPLR 4518 certification. High probative value is assigned to the stated results.
In criminal proceedings, “forensic” DNA testing is similarly regulated by statutes, including Executive Law article 49-B, and a substantial body of case law. There is even a relatively recent provision that establishes procedures and standards that the courts must apply to applications to conduct new DNA testing as part of the process of moving to vacate a judgment of conviction (see, CPL 440.30 [1-a]). Presently, there are no statutory provisions that structure an equivalent procedure to apply to an application for testing in the context of a motion to set aside or abrogate a finding of paternity. There are other significant differences. In criminal cases, there are no automatic admissibility provisions for the trial setting and statutory evidentiary presumptions that are peculiar to Family Court paternity proceedings. In spite of these and other differences, there remains a common thread of strict testing standards that must be met in civil and criminal litigation. Hence, the State has rules and regulations which govern the licensing of forensic and paternity laboratories, the manner in which DNA specimens are collected, the storage of specimens, the analysis of data, and the like; this is all to insure that the highly probative results are reliable.
Procedures in this Case
In the affidavit annexed to these DNA results, Dr. Cutter swears that Micro-Diagnostics is approved to do paternity DNA testing by the DOH. She goes on to “CERTIFY AND *233 AUTHENTICATE” that samples were taken in this case from Barbara Ann W. (mother), George W.-Wy. (child) and David Wy. (father). DNA tests were “administered under court order pursuant to Section 418 and 532 of the Family Court Act or an administrative order pursuant to Section 111-k of Social Services Law.” She swears that this court order arose in a case entitled, “In the Matter of Paternity Petition of_, Commissioner, assignee of W., Barbara Ann (petitioner) against Wy., David (respondent).” Dr. Cutter places the venue in “Family Court of the State of New York County of _.” As noted above, she swore to all of this on January 13, 1999, the date the television show was recorded.
There are empty spaces because, in fact, there was no court case pending, and there was no court order. The samples were taken as a result of an order placed by a private person employed by the show.
The applicable regulations indicate that the laboratories that are authorized to conduct paternity testing by the State of New York are defined as a specialized subgroup within the broader category of “clinical laboratories” (see, 10 NYCRR subpart 58-1). Only an authorized laboratory can accept a sample for purposes of diagnosis (10 NYCRR 58-1.7 [a]). In addition, these laboratories cannot accept a sample from the general public for purposes of diagnosis, but only from various professionals who are either employed by or licensed to practice by a governmental agency in New York State. This includes such professions as doctors, dentists and police officers (see, 10 NYCRR 58-1.7 [b]). When it comes to paternity, however, the list is limited to one profession. It states, “(vi) judges ordering paternity tests under the Family Court Act” (10 NYCRR 58-1.7 [b] [2]).
In this case, samples were accepted from a private nonprofessional without a court order. An inaccurate sworn certification that states a diagnostic result in a manner intended to insure acceptance into evidence in a court was prepared. This is troublesome. Any sworn certification should be accurate and this type of certification is especially important to protect proper use of available scientific aids to litigation. No explanation has been offered by the laboratory; Dr. Cutter declined the Law Guardian’s request to testify.
The show’s “paternity expert,” Mr. Gelb, testified the steps which brought these samples to the laboratory were unimportant. According to him “testing” refers to events in the laboratory and the source of the samples or methods of collection are irrelevant to DOH testing standards. This is not correct. Both *234 by statutes and regulations, New York State has limited the admissibility of this type of certified DNA result to scientific findings that resulted from protocols that restrict the acquisition, handling and testing of samples to professionals acting under a court order. The failure to recognize these standards resulted in a series of significant violations of the Public Health Law and DOH standards.
DNA samples for purposes of paternity testing must be taken at a facility operated by an authorized laboratory (see, 10 NYCRR 58-1.7 [c] [1 ]-[6]). Specifically, the “phlebotomist statement” on the “chain of custody” document in this case indicated, “I have drawn, collected, packaged and sealed these sample(s), as well as, have witnessed the above signature(s) at the homes of guests.” The phrase “at the homes of guests” was placed on a blank line on the form that called for the phlebotomist to name the “facility” where the sample was taken.
The word “facility” as the place where the sample was taken is significant. According to the DOH rules, the facility must be (1) a “collecting station” (see, 10 NYCRR 58-1.7 [c] [2]) which is “a facility, fixed or mobile, operated by a clinical laboratory under permit, for the collection, drawing and/or temporary storage of materials derived from the human body, until forwarded to the clinical laboratory for testing,” (2) a “transfer station” (see, 10 NYCRR 58-1.7 [c] [3]) which is similar to a collecting station, or (3) a “temporary collecting station” (see, 10 NYCRR 58-1.7 [c] [41) which is a “one time, on-sight facility, operated by a clinical laboratory under permit, with the prior approval of the department.”
The “chain of custody” document states these samples were taken from David Wy., Barbara Ann W. and George W.-Wy. in the uncontrolled setting of their homes. This should have resulted in rejection of the sample upon arrival at the laboratory.
The regulations require that the laboratory’s phlebotomist or a sample taker must demand identification and the laboratory must be prepared to document that the persons who provided samples were not impersonators. The New York State clinical laboratory standards specifically state that:
“The laboratory shall establish procedures to ensure the verification of the identity of all individuals who present themselves for testing; and such verification shall:
“a) include photographs, fingerprints or similar evidence of identity; and,
*235 “b) be documented and retained as part of the record.” (See, http://www.wadsworth.org/labcert/document.pdf, at 8-12.)
These procedures were not followed in this case. Although there is a factual dispute as to whether or not any pictures were taken, the evidence is clear that the laboratory accepted these samples without photographs, fingerprints or any other proper verification of identity. This violation will be discussed in further detail later in this decision.
The DOH regulations and departmental standards go on to require that laboratories have in place standards to insure that specimens have been properly collected and handled. Specifically, it is stated:
“Paternity/Identity Standard 10
“Specimens shall be collected, received, handled, sampled and stored so as to preserve their identity, integrity and security.
“Paternity/Identity Standard 11
“The name of the phlebotomist or specimen collector shall be documented in the record.
“Paternity/Identity Standard 12
“The laboratory shall develop and implement chain-of-custody procedures.
“Paternity/Identity Standard 13
“The chain-of-custody for each specimen shall be maintained and documented in the record.” (See, id., at 8-13 — 8-14.)
It may well be that Micro-Diagnostics has established such procedures and placed documentation of their existence on file with DOH as part of the certification or licensing process. But, the evidence cannot support a finding that this laboratory did anything to protect the collection or handling of these specimens before reaching the laboratory.
The evidence does show that Micro-Diagnostics took no part in the use of their kits, gathering of samples, or the delivery of specimens. Instead, they sent a supply to Mr. Alan Gelb at his unlicensed business, “Paternity & Transfusion Consultants” at 15 West 72nd Street, Suite 15G, New York, New York. During his testimony Mr. Gelb emphasized that his enterprise is an office, “not a laboratory.” He described his role as one of a “broker.” He maintains a stock of Micro-Diagnostics paternity kits in his office and receives a fee in return for distributing them. It is an “over the counter” operation; the customer does not need a prescription or court order to pick up their “do it *236 yourself’ DNA paternity kit. They then place whatever specimens they want in the containers, place a name and signature on each label and send them back to the laboratory to be tested. This is essentially what happened in this case.
On or about January 7, 1999, Mr. Gelb received a phone call from a person he had been dealing with for some time, the producer of “The Sally Jesse Raphael Show.” He knows her as “Sally Ann.” She placed an order for paternity kits to be completed within six days; the tight schedule had to be met so that DNA results could be ready for the videotaping of the show on January 13, 1999.
Because time was limited Mr. Gelb elected to prepare kits for testing by the quicker “PCR” method, rather than the slower “RFLP” technique. He was unable to recall what the letters “RFLP” and “PCR” represented. RFLP refers to restriction fragment length polymorphism and PCR refers to polymerase chain reaction. Efforts to have him explain all of the differences between these two methods resulted in his telling this court that they were really the same and one was just faster than the other. These statements fly in the face of the scientific explanations that have been provided in two significant forensic DNA cases in the State of New York. In People v Wesley (83 NY2d 417, supra, affg 183 AD2d 75, affg 140 Misc 2d 306) the courts at each level described the RFLP method. RFLP was accepted by the Court of Appeals in 1994. The fact that PCR testing begins with smaller amounts of DNA that must be copied before comparison testing can begin and other differences from the RFLP method are described in People v Palumbo (162 Misc 2d 650 [1994]) and People v Morales (227 AD2d 648 [2d Dept 1996]). The Court of Appeals has not yet ruled on the acceptability of PCR. It is understandable that Mr. Gelb was not aware of the legal developments regarding these two types of tests, but as a self-proclaimed expert, he should have had some knowledge of the very different steps that each involves.
In the end, Mr. Gelb acknowledged that his expertise is credentialed by a 1959 bachelor of science degree in Biology. He has no formal training in DNA; his knowledge in this area is based upon a meeting he had with the director of a private laboratory. He could not describe what provision of the DOH regulations authorized him to act as an unlicensed distributor or “broker” of DNA testing kits. However, he did recognize that there were DOH requirements that had to be met to insure that samples were taken only from properly identified people *237 and he made some effort to comply. He had an employee gather up the kits and put them in a clear plastic bag together with the Micro-Diagnostics’ “chain of custody” document. In compliance with the State regulations, the words “Staple Photo Here” were preprinted in each of the lower corners of this document. In addition, Mr. Gelb hand wrote onto the chain of custody paper the following: “Please sign picture both mother and alleged father. Please staple picture here,” and drew an arrow toward the preprinted words. On another portion of the form, he hand wrote in large letters, “Polaroid Picture must be taken of all individuals!!”
He testified that later in the day someone from the television show came to his office and picked up the kits. He could not recall who this was, it may have been Sally Ann. The identity was not recorded. Once the kits left his office, Mr. Gelb never saw them again and did nothing to insure their proper handling or use.
It is clear to the court that Mr. Gelb’s alleged expertise in DNA, as well as his role in the entire testing process in this case, adds nothing to the reliability of the test process or its results. This court also has concerns about his role as a “broker.” He indicated that he was paid a commission of approximately $400 by Micro-Diagnostics. He claimed he received nothing for appearing on the television show. The counsel for the show contradicted this. Full screen advertisements for Mr. Gelb’s business were shown three times during the broadcast. He did not have to pay for this publicity. The show considered this to be a “promotional consideration” with a value of at least $2,250. All these financial dealings appear to be problematic. Public Health Law §§ 586, 587 (1) (f) and (h); (2) (i); (5) and § 578 appear to prohibit various forms of fee-sharing payments or exchange of any form of consideration between a clinical laboratory and a purveyor or any other private person with respect to laboratory testing services. These problems do not have to be resolved in this decision, but the use of the kits after leaving Mr. Gelb’s office presents significant problems that are directly relevant.
The next witness who saw the kits and chain of custody document was Denise Haywood. She testified that she is an assistant producer of “The Sally Jesse Raphael Show.” She first saw these items late in the afternoon of January 7, 1999, in Sally Ann’s office. At this point, they were no longer in a clear plastic bag, but in a Federal Express envelope addressed to Micro-Diagnostics with a return address to Mr. Gelb at “Paternity & *238 Transfusion Consultants.” Sally Ann told Ms. Haywood that she was to take a limousine to David Wy.’s and Barbara Ann W.’s respective homes in Suffolk County to obtain DNA samples. The producer showed her how to swab the inside of the mouths to obtain the samples.
Unfortunately, no testimony was offered as to this producer/ DNA instructor’s knowledge and technical abilities. This is significant because although Ms. Haywood described herself as a “phlebotomist” on the chain of custody document, this lends an inaccurate air of professionalism to the sample-taking process. She is not a phlebotomist and/or any other type of trained medical technician. Her education consists of a bachelor’s degree in Public Relations and Communications. This was to be her first effort at taking DNA samples and obviously she should have received instructions from someone with proper training. Perhaps the laboratory was not aware of her real status when they accepted the samples, did the testing or prepared the certification. However, close examination of the chain of custody form should have raised some suspicion. Specifically, under the place where Ms. Haywood signed there was a box where she should have filled in her phlebotomist’s MDx identification number. Ms. Haywood indicated “None.”
With respect to the photograph requirement stated on the chain of custody form, Sally Ann instructed Ms. Haywood to ignore all the preprinted and handwritten instructions; there was no need to attach Polaroid pictures of David Wy., Barbara Ann W. and George W.-Wy.
According to Ms. Haywood, she decided that she would take pictures anyway and purchased a disposable camera after she left the studio. When she arrived at the Wy.’s and W.’s homes, she claimed that she took photographs of each of the three people. After depositing the completed sample kits at a Federal Express office, she eventually brought the disposable camera with its undeveloped film back to Sally Ann’s office. Ms. Haywood testified that that was the last she saw of it. Sally Ann has now left the show and moved to an unknown location in California. There is no way to determine the fate of the pictures.
Ms. Haywood also indicated that there was a pair of rubber gloves in the specimen kit’s package, but she could not recall if she wore one or both of these gloves when she did the swabbing. She did remember disposing of at least one glove in one of the homes she visited and is certain that she used the same glove or gloves to take samples from Ms. W. and her son, George W.-Wy.
*239 Ms. Haywood testified that she made David Wy. and Barbara Ann W. confirm their identity by showing photo identifications. Unfortunately, she had no memory of the type of photo identification presented and made no record of what she was shown.
David Wy. testified in support of Ms. Haywood, recalling that he showed her a photo identification, she took his picture and wore rubber gloves when taking the samples. Barbara Ann W. disagrees. She testified that Ms. Haywood did not demand photo identification, did not take any pictures of herself or her son, and did not wear rubber gloves when taking the samples. These disputed memories cannot be reconciled. Ms. Haywood’s inability to recall the brand, appearance, whether or not it had a flash or any other characteristics of the disposable camera has not been helpful.
The fact is, there are no photographs, fingerprints or other verification of identity attached to the chain of custody documents and this problem cannot be ignored. This step is significant to the integrity of the entire testing process. It is necessary to verify that the samples were truly taken from the necessary party and not provided by a friendly imposter. Misuse and switching of photo identifications by similar looking young people have become common in our society. The DOH identity verification rules guard against this obvious opportunity for deceit. The financial stakes for a person in Mr. Wy.’s position are substantial. It was naive and reckless to swear to the accuracy of the DNA result when the simple and necessary protections were not in place. Micro-Diagnostics should not have certified that David Wy. is not the father without a photograph, fingerprint or similar evidence of identity.
The samples arrived at the laboratory on January 8, 1999, apparently with little or no time to correct any errors. The package was marked “Rush.” The test had to be completed and reported in time for the airing of the show on January 13. This did not justify the complete disregard of the New York protocols. This sense of exigency had nothing to do with a legal or medical necessity. The only pressing concern was the need to comply with the performer’s motto, “The show must go on.” Once the laboratory accepted these samples, the entertainment value won out and all pretense to legal acceptability or scientific reliability should have ended. There was no need to employ the certification that is intended for litigation. The show would have been the same if someone simply recited the unreliable result.
*240 Conclusions
In the end, the lack of a court order for the testing in this case proved to be much more than a technical blunder. It was just one indication of what proved to be a course of conduct of repetitive, amateurish, and reckless disregard for laws and rules that are intended to insure the validity and propriety of DNA test results. This is exactly the type of problem that is intended to be avoided by CPLR 4518 (d) and (e), the Public Health Law and New York State Department of Health Regulations. It is the type of problem that might have been avoided if the Micro-Diagnostics kits had remained within the sealed environment of professional handling that is expected and required under these strict standards. It is a problem that was created in this case when the laboratory relinquished control of their kits by providing them to Mr. Gelb. He, in turn, treated them as his merchandise and passed them on to nonprofessionals. From there the kits continued to trip along from one blunder to another, back to the laboratory and on to a certified result.
If not in this case, in some future case, this uncontrolled commerce will cause inaccurate results because of mistakes by well-intentioned amateurs or fraud by interested parties. This could cause fact finders, both jurors and jurists, to lose confidence in DNA as a highly effective evidentiary tool. So much scientific and legal work has been necessary to bring DNA into the courtroom, that it is senseless to accept practices that will squander its reputation. In the future, this court will require strict compliance with CPLR 4518 (d) and (e). The test must be the result of a court order. There has to be a sense that there is a waiting legal forum where the laboratory may be required to explain its methods and defend its conclusions.
The relevant statutes, regulations, and court decisions convey a clear message that DNA testing should not be frivolously employed in litigation. In this case, the testing was done for frivolous entertainment purposes and has little or no legal value. It is not probative on the issue of identification of the father; it is not clear and convincing evidence of anything other than an ongoing paternity dispute.
At the same time, it is not practical to simply ignore all that has resulted from Mr. Wy.’s call to the television show and the mother’s poor judgment in reopening the paternity debate. Rejection of the test, without more, may not be in the best interests of this child. The questions and bitterness must end. Mr. Wy.’s desire to retract his 1991 admission has ripened into *241 a willingness to totally disregard court orders, accumulate large child support arrears, risk incarceration, and appear on national television. There is no purpose served by sending the parties off, only to return by a different procedural gambit. Undoubtedly, they will be back. At this time, Mr. Wy.’s child support problems have taken on new significance. He is now employed “on the books” and, for the first time, DSS is recouping funds that they have spent to raise this child. Because of the amount that is due, a willful violation proceeding could result in incarceration with a substantial purge figure.
Under these circumstances, this court is constrained to order that the parties submit to DNA testing that is to take place in strict compliance with the existing laws and regulations.
The cost will be borne by Mr. Wy. in accord with Family Court Act § 532. It is his change of heart that makes the test necessary. The offer by “The Sally Jesse Raphael Show” to pay for this must be rejected because of potential conflicts with the payment provisions set forth in the Public Health Law.
David Wy., Barbara Ann W. and George W.-Wy. are directed to provide samples for DNA testing, to be conducted by Lab Corp Inc. Samples are to be collected at the facility that Lab Corp Inc. maintains for this purpose on the second floor of this Family Court building on a date certain set forth in the separate order of this court.