Kim THOMAS o/b/o N.T., Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security,[1] Defendant.

No. 03 Civ. 3980(RJH)(DF).

United States District Court, S.D. New York.

Dec. 9, 2009.

**1.** Michael J. Astrue, the current Commissioner of Social Security, took office as of February 12, 2007; pursuant to Fed.R.Civ.P. Rule 25(d)(1), he was then automatically substituted as defendant for his predecessor in office, Joanne B. Barnhart, who had been named as defendant in Plaintiff's Complaint.

Kim Thomas, Covington, GA, pro se.

Leslie A. Ramirez–Fisher, United States Attorney's Office, Southern District of New York, New York, NY, for Defendant.

### MEMORANDUM OPINION AND ORDER

RICHARD J. HOLWELL, District Judge.

Plaintiff Kim Thomas brings this action on behalf of her daughter, N.T., to challenge a decision of the Commissioner of Social Security denying N.T.'s application for surviving child insurance benefits under the Social Security Act (the "Act"). The case turns on whether N.T. is the child of deceased wage earner Ronald Van Thomas ("Thomas"), a question that an administrative law judge ("ALJ") answered in the negative in a decision that later became the final decision of the Com-

missioner. Magistrate Judge Debra Freeman issued a comprehensive report and recommendation (the "Report"), familiarity with which is presumed, recommending that the Court reverse the Commissioner's decision and remand for benefits calculation. The Commissioner filed timely objections to the report on two grounds: (1) contrary to the Report, substantial evidence supported the ALJ's finding that a DNA test showing a 99.69% probability of paternity was not clear and convincing evidence that Thomas was N.T.'s father; and (2) the Report erred in failing to consider the ALJ's conclusion that plaintiff did not rebut the legal presumption that N.T. was the biological child of a different man, plaintiff's ex-husband. Having conducted a *de novo* review of the relevant portions of the Report, the Court adopts Judge Freeman's conclusions and remands to the Commissioner for benefits calculation.

## DISCUSSION

### I. Standards of Review

#### A. Review of the Magistrate Judge's Report

A district court may designate a magistrate to hear certain motions and to submit a report and recommendation as to how the Court should resolve the motions. *See* 28 U.S.C. § 636(b)(1)(2005). Within ten days of service of the recommendation, any party may file written objections. *Id.* In evaluating the magistrate's report, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*

The court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; *see, e.g., Eisenberg v. New England*

*Motor Freight, Inc.*, 564 F.Supp.2d 224, 226–27 (S.D.N.Y.2008). "If, however, the party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Silva v. Peninsula Hotel*, 509 F.Supp.2d 364, 366 (S.D.N.Y.2007) (citations omitted). Where a party makes "merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition," the court reviews for clear error. *Edwards v. Fischer*, 414 F.Supp.2d 342, 346–47 (S.D.N.Y.2006) (internal quotation marks and citations omitted). Parties may not "attempt to relitigate the entire content of the hearing ... [and] are not to be afforded a 'second bite at the apple ....'" *Camardo v. General Motors Hourly–Rate Employees Pension Plan*, 806 F.Supp. 380, 382 (W.D.N.Y.1992).

## B. Review of the ALJ Decision

■■■ A federal district court reviewing and ALJ decision in a social security appeal looks to whether the correct legal standards were applied and whether the agency's factual determinations are supported by "substantial evidence." *Acierno v. Barnhart*, 475 F.3d 77, 80–81 (2d Cir. 2007) (citing *Pollard v. Halter*, 377 F.3d 183, 188 (2d Cir.2004)); *see, e.g., Jordan v. Comm'r of Soc. Sec.*, 194 Fed.Appx. 59, 61 (2d Cir.2006) (citing *Urtz v. Callahan*, 965 F.Supp. 324, 326 (N.D.N.Y.1997)). Substantial evidence is "more than a mere scintilla" of evidence. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jordan*, 194 Fed.Appx. at 61 (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir.1988)). "Where the Commissioner's decision rests

on adequate findings supported by evidence having rational probative force, [the Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir.2002).

Review of the ALJ's legal conclusions is *de novo. Pollard*, 377 F.3d at 188; *see also Rivera v. Sullivan*, 771 F.Supp. 1339, 1351 (S.D.N.Y.1991) (observing that "with respect to ... legal conclusions, or more generally ... application of legal principles, judicial review is *de novo* ").

## II. Plaintiff is permitted to proceed pro se on behalf of her child

■■■ Before reaching the merits, the Court considers whether Ms. Thomas may bring this action *pro se* on behalf of her daughter. Although a litigant may represent herself in federal court, *Machadio v. Apfel*, 276 F.3d 103, 106 (2d Cir.2002), "a non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child." *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir.1990). A district court has a duty to raise this issue *sua sponte. Berrios v. N.Y. City Hous. Auth.*, 564 F.3d 130, 133 (2d Cir.2009) (citing *Wenger v. Canastota Cent. School Dist.*, 146 F.3d 123, 125 (2d Cir.1998), *overruled on other grounds by Winkelman v. Parma City School Dist.*, 550 U.S. 516, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007)). However, if a district court, after an "appropriate inquiry in to the particular circumstances of the matter at hand," determines that the non-attorney parent has a "significant stake in the outcome of the litigation," a parent may bring an action in federal court on behalf of their child without an attorney. *See Machadio*, 276 F.3d at 107. Here, the Social Security Administration would most likely pay N.T.'s benefits to Ms. Thomas as N.T.'s "representative payee." *See id.* at 106 (holding that as the natural parent

with custody, plaintiff was most likely the one that would receive Social Security benefits for child, and could therefore represent the child in court). Any money received by N.T. would lighten Ms. Thomas's burden of caring for N.T. and increase the availability of money for other expenses in the family household. The Court therefore finds that the plaintiff has a sufficient interest to represent her daughter *pro se* in federal court.

### III. The ALJ's decision is not supported by substantial evidence

█ The Commissioner argues Judge Freeman erred in finding a lack of substantial evidence for the ALJ's conclusion that the DNA test result did not constitute clear and convincing evidence of Thomas's paternity. The Commissioner contends that evidence of deficiencies in the chain of custody of the DNA samples amply supported the ALJ's determination. This argument, however, presupposes that the ALJ in fact based his decision on the supposed gaps in the chain of custody, a proposition that the text of the decision calls into doubt. Before considering the chain of custody, the ALJ found that the DNA test was invalid because it was not performed during Thomas's lifetime. (R. at 124.) Defendant concedes that this was legal error; New York law does recognize posthumous DNA tests as "clear and convincing" evidence of paternity in circumstances such as these. (*See* Report at 522; Def. Obj. at 5 n. 3.) From the text of the ALJ decision, it is impossible for the Court to conclude that, but for this legal error, the ALJ still would have found the DNA test to be of "[in]sufficient probative value to establish paternity." (R. at 124.) The decision contains only one paragraph on the issue, which first finds the test inadmissible as posthumous, and second, as something of an afterthought, opines that the DNA samples' chain of custody is in-

firm. Had the ALJ not erred in his application of New York law, he may well have found the DNA test to be "clear and convincing" evidence despite concerns over the chain of custody.

Even standing alone, however, the ALJ's two sentences of findings about gaps in the chain of custody are insufficient to support the decision that N.T. was not Thomas's child. The briefing record contains much discussion about the test's admissibility—specifically, whether it could be admitted as a lab-certified DNA test under N.Y. C.P.L.R. § 4518(d)-(e). But defendant rightly points out in its objections that the salient issue concerning the chain of custody is "not one of admissibility, but of the weight to be accorded the [DNA] evidence." (Def. Obj. at 5.) The ALJ could consider the DNA test whether or not it was admissible under New York evidence rules. *See* 42 U.S.C. § 405(b)(1)(2008). The question is whether the DNA test is sufficiently persuasive to constitute "clear and convincing" evidence of paternity, despite any problems in the chain of custody.

Defendant, having recognized that the issue is not one of formal admissibility, nonetheless submits a formalistic argument: that the ALJ's decision to disregard the DNA test should be upheld because (1) Micro Diagnostics (the testing laboratory) did not submit a chain of custody affidavit describing the handling of plaintiff's and N.T.'s DNA samples; and (2) the New Jersey Toxicology Laboratory submitted an incomplete chain of custody letter that failed to explain how it acquired and stored Thomas's sample. (Def. Obj. at 6.) This argument is formalistic because it questions the propriety of the evidence without actually challenging the persuasive force of the test result showing a 99.69% probability of paternity. The evidence that plaintiff and N.T. had their samples

taken at a Micro Diagnostics laboratory in Manhattan is uncontroverted. (R. at 26, 73.) Though the lab did not submit a chain of custody affidavit, it did certify the test result, including therein an affirmation from the Director that the "genetic specimens" came from the named individuals. (R. at 73.) No one suggests the samples were ever out of the lab's custody. Similarly, the evidence that New Jersey police took Thomas's DNA samples after his death, (R. at 25), and that the New Jersey State Toxicology Laboratory transferred the samples to Micro Diagnostics, (R. at 87), is not disputed. That the record lacks boilerplate documents confirming Thomas's samples' route from police custody to the toxicology lab does not knock the test from the realm of "clear and convincing evidence," especially here, where the eventual test result ridicules the possibility that N.T.'s sample might have been tested against a random sample misplaced within the state system. *See People v. McCutcheon*, 122 A.D.2d 169, 504 N.Y.S.2d 708, 708 (2d Dep't 1986) (chain of custody rule relaxed where evidence provides a "reasonable assurance" of consistency and lack of tampering); *People v. Porter*, 46 A.D.2d 307, 362 N.Y.S.2d 249, 254 (3d Dep't 1974) ("[W]here the circumstances provide reasonable assurances of identity and unchanged condition and it would be impossible or an unreasonable requirement to produce each physical custodian as a witness, there has been a relaxation of the [chain of custody] rule.").

Comparison to a case defendant cites is helpful. In *Barbara Ann W. v. David Wy.*, 183 Misc.2d 228, 701 N.Y.S.2d 845 (N.Y.Fam.Ct.1999) (cited in Def. Mem. at 10–11), an action to vacate an order of filiation, the Court found that a DNA test excluding the plaintiff as the child's father did not constitute clear and convincing evidence of a lack of paternity. An assistant producer for the "Sally Jesse Raphael

Show" with no medical training took the DNA samples in the parties' homes and sent them to the lab (also Micro Diagnostics), which rushed to complete a facially flawed report in time for a show about the paternity dispute. *Id.* at 852–54. The Court concluded there was insufficient evidence "to verify that the samples were truly taken from the necessary party and not provided by a friendly imposter." *Id.* at 853.

The distinctions are instructive. First, the DNA testing postures are reversed whereas in *Barbara Ann* the purported father could skew the test in his favor by substituting the sample of any random "imposter," *id.*, here the imposters would need to be chosen brilliantly (by the New Jersey technicians or by plaintiff, or maybe both) to engineer the three-pronged family footprint shown in the test result. (R. at 73.) Secondly, the chain of custody evidence in this case does not contain *Barbara Ann*'s red flags. Unlike the situation with the assistant producer turned untrained lab technician, there is no reason to doubt the evidence that plaintiff and N.T. had their samples taken at Micro Diagnostics, (R. at 26, 73); indeed, the examining ALJ declined to ask more than a pair of cursory questions on the subject. *See Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996) ("the ALJ, unlike a judge in a trial, must herself affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding") (citation omitted). Nor is there reason to doubt that the sample New Jersey transferred to Micro Diagnostics was Thomas's. (R. at 87.) In short, formalisms aside, the record provides no "substantial evidence" that the DNA test was anything other than conclusive proof of Thomas's paternity. *See Giddings v. Astrue*, 333 Fed.Appx. 649, 654–55 (2d Cir. 2009) (reversing for lack of substantial evi-

dence ALJ decision that failed to undercut countervailing medical evidence); *cf.* N.Y. C.P.L.R. § 4518(d) ("If ... a genetic marker test or DNA test ... indicates at least a ninety-five percent probability of paternity, the admission of such record or report shall create a rebuttable presumption of paternity.").

Defendant has protested that Judge Freeman invaded the ALJ's province by "erroneously re-weigh[ing]" the chain of custody evidence. (Def. Obj. at 7.) To be clear, the Court, like Judge Freeman, is not re-weighing anything. Rather, applying the substantial evidence standard, the Court finds a lack of "such relevant evidence as a reasonable mind might accept as adequate" to support the ALJ's conclusion that the DNA test result did not establish that Thomas was N.T.'s father. *Richardson,* 402 U.S. at 401, 91 S.Ct. 1420. It is a matter of substantial evidence review, not re-weighing.

▮ Defendant also argues that Judge Freeman erred in not addressing the ALJ's conclusion that plaintiff did not rebut the presumption of legitimacy. (Def. Obj. at 9.) Under the presumption of legitimacy, a child born during a marriage is presumed to be the biological product of the marriage. *Fung v. Fung,* 238 A.D.2d 375, 375–76, 655 N.Y.S.2d 657 (2d Dep't 1997). Plaintiff was still legally married to a different man at the time of N.T.'s birth (though she had obtained a protective order against him 15 months earlier and had not lived with him for 20 months), so under this rule N.T. was initially presumed the ex-husband's child. But as defendant admits, the presumption of legitimacy "may be rebutted by clear and convincing proof excluding the husband as the father or otherwise tending to prove legitimacy." *Id.* at 376, 655 N.Y.S.2d 657. To argue the presumption here, then, is to restate the issue under a new name. Judge Freeman

found, and the Court agrees on *de novo* review, that the DNA test constituted clear and convincing evidence that Thomas was N.T.'s father. By logic, and without even considering the substantiated rift in plaintiff's relationship with her ex-husband, the test clearly and convincingly excludes the ex-husband by establishing a 99.69% probability that Thomas was the father. The presumption of legitimacy is therefore rebutted. *See Green v. Chater,* No. 94 Civ. 8404, 1995 WL 688918, at *2 (S.D.N.Y. Nov. 20, 1995) (reversing ALJ decision that plaintiff had failed to rebut the presumption of legitimacy).

Finally, the Court adopts Judge Freeman's recommendation to reverse the Commissioner's decision and remand for benefits calculation, rather than remanding for further evidentiary hearings. While district courts often remand cases to the agency for further review, a district court may also reverse a Commissioner's decision. *See* 42 U.S.C. § 405(g) (2008) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."); *Green–Younger v. Barnhart,* 335 F.3d 99, 109 (2d Cir.2003) (reversing ALJ's decision without remanding for further hearings where ALJ relied on erroneous legal standard and evidence was not supported by substantial evidence). Further hearings are not warranted here because plaintiff has already proven by clear and convincing evidence that N.T. is Thomas's child. *See Butts v. Barnhart,* 388 F.3d 377, 385 (2d Cir.2004) (citing *Rosa v. Callahan,* 168 F.3d 72, 83 (2d Cir.1999) ("where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calcula-

tion of benefits")); *Shaw v. Chater*, 221 F.3d 126, 135 (2d Cir.2000) (declining further remand because record provided sufficient proof to support plaintiff's claim). Moreover, as plaintiff first applied for benefits in December 1999, the exceptionally long process she has endured also argues against remanding for further review. *See Butts*, 388 F.3d at 387 ("the hardship to a claimant of further delay" is relevant to remand decision); R. at 47–52.

## CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Freeman's Report and Recommendation, reverses the Commissioner's decision, and remands the case to the Commissioner for the calculation and awarding of benefits. The Clerk of the Court is requested to close this case.

SO ORDERED.

## REPORT AND RECOMMENDATION

DEBRA FREEMAN, United States Magistrate Judge.

**TO THE HONORABLE RICHARD J. HOLWELL, U.S.D.J.:**

### INTRODUCTION

Kim Thomas ("Plaintiff"), on behalf of her daughter, N.T., brings this action to challenge the decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") that N.T. was not entitled to surviving child's insurance benefits ("Benefits") under the Social Security Act (the "Act") because she did not demonstrate that she was the surviving child of the deceased wage earner, Ronald Van Thomas ("Thomas"), within the meaning of the Act. (R. at 125–26.)[2] The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (*See* Dkt. 14.)[3] For the reasons set forth below, I respectfully recommend that Defendant's motion be denied, the decision of the Commissioner be reversed, and the case be remanded to the Commissioner for the calculation and awarding of Benefits.

### BACKGROUND

#### A. Procedural History

On December 29, 1999, Kim Thomas filed an application for Benefits on behalf of N.T.,[4] claiming that N.T. was a survivor of deceased wage earner Thomas. (R. at 47–52.) The application was denied in February, 2000. (*Id.* at 58.) Ms. Thomas filed a request for reconsideration of the application on September 15, 2000, and the application was again denied on November 5, 2000. (*Id.* at 55–61.) Plaintiff

---

**2.** "R." refers to the Record of the administrative proceedings.

**3.** Although Plaintiff, who is proceeding *pro se*, has not formally filed a cross-motion pursuant to Rule 12(c), she has filed papers in opposition to the motion and in support of her position that N.T. is, in fact, Thomas's child and is thus entitled to Benefits. (*See* Dkt. 16.) Under the circumstances, the Court has the authority to affirm, modify, or reverse the decision of the Commissioner. *See Lugo v. Gardner*, 253 F.Supp. 721, 722 (S.D.N.Y.1966) (in the absence of a cross-motion pursuant to Rule 12(c), the plaintiff's opposing submissions were deemed "sufficient to mobilize the

court's power under 42 U.S.C. § 405(g) 'to enter … a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.' ") (citing 42 U.S.C. § 405(g)).

**4.** At the time the application was filed, Kim Thomas and N.T. shared the last name of Ms. Thomas's ex-husband, John R. Bonnett. (*See* R. at 47, 75) In May, 2000, Plaintiff changed N.T.'s last name to the present one. (*Id.* at 26, 103–04.) During the pendency of her application, Ms. Thomas divorced Mr. Bonnett and took on Mr. Thomas's last name. (*Id.* at 113, 135.)

than requested an administrative hearing (*id.* at 62–63), which was held on July 13, 2001 before an administrative law judge ("ALJ"). (*Id.* at 15–46.) ALJ Kenneth L. Scheer considered the case *de novo* and, on October 23, 2001, denied Plaintiff's application. (*Id.* at 5–12.) The ALJ's decision became the final decision of the Commissioner upon the Appeals Council's denial of Plaintiff's request for review. (*Id.* at 2–3.)

On May 13, 2003, Plaintiff commenced this action. (Dkt. 2.) On December 1, 2003, the Court (Koeltl, J.) reversed and remanded the case to the Social Security Administration pursuant to sentence six of 42 U.S.C. § 405(g) (2006) (Dkt. 9; R. at 149–50.)[5]

On February 17, 2004, the Appeals Council remanded the case to an ALJ for further proceedings. (R. at 152–53.) On February 24, 2005, ALJ Charles Auslander, Jr., held a supplemental hearing in North Atlanta, Georgia, where Plaintiff was then living, and Plaintiff appeared at that hearing *pro se.* (*Id.* at 127–45.)[6] On April 6, 2005, ALJ Auslander issued a decision denying Plaintiff's application for Benefits. (*Id.* at 117–26.) The ALJ's decision became the final decision of the Commissioner, on March 20, 2007, upon the Appeals Council's denial of Plaintiff's request for review. (*Id.* at 111–12.)

Plaintiff then resumed this action, whereupon the Commissioner moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 14.)

### B. *Evidence From the Initial Proceedings*

Plaintiff married John R. Bonnett ("Bonnett") on March 7, 1994. (R. at 75–66.) Plaintiff testified that, in April 1995, she moved away from Bonnett and had no further sexual relations with him. (*Id.* at 21–22, 76.) On September 6, 1995, a protective order was issued by the Bronx Family Court ordering Bonnett to stay away from Plaintiff, Plaintiff's child, and Plaintiff's home. (*Id.* at 89.) According to Plaintiff she began having sexual relations with Thomas in November, 1995 and continued through June, 1998. (*Id.* at 22, 76, 80.) Plaintiff testified that she and Thomas had never lived together, but that, during the period of their relationship, she had slept at his house on a regular basis. (*Id.* at 22, 28, 76.)

Plaintiff gave birth to N.T. on December 17, 1996. (*Id.* at 17, 74.) At the time of N.T.'s birth, Plaintiff and Bonnett were still married, and Bonnett was named on the birth certificate as N.T.'s father. (*Id.* at 17–19, 74.) According to Plaintiff, at the time of N.T.'s birth, she provided a notarized letter to the hospital indicating that she did not wish for Bonnett to be listed as the father. (*Id.* at 17–19.) The hospital, however, reportedly persuaded Plaintiff to give Bonnett's last name to N.T. so that the hospitalization costs of the birth would be paid for by Bonnett's health insurance. (*Id.*)

On March 11, 1997, the New York State Family Court awarded custody of N.T. to Plaintiff's mother, Lillie Greene. (*See id.*

---

**5.** Sentence six provides that "[t]he court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security." 42 U.S.C. § 405(g).

**6.** In the supplemental hearing, the ALJ removed certain exhibits which pertained entirely to the wrong claimant, and accordingly, these documents have been redacted from the administrative record. (R. at 64–69.)

at 71 (modifying the original custody order, which is not contained in the record).) According to a subsequent petition for modification of the original order, Plaintiff had testified in 1997 that Bonnett was N.T.'s biological father. (*Id.*)

Thomas was shot and killed on June 6, 1999. (*Id.* at 22, 70, 173.) Plaintiff petitioned for a modification of the custody order on June 25, 1999, seeking custody of N.T. because her financial situation had improved and because she wanted N.T. to be covered by her newly obtained health insurance. (*Id.* at 71.) In the petition, Plaintiff also requested that it be stated on the record that, contrary to her previous statement before the judge during the March 1997 proceedings, Bonnett was not N.T.'s biological father. (*Id.*) Plaintiff also sought to amend N.T.'s birth certificate and last name. (*Id.*)

According to Plaintiff, while Thomas was alive, he had "open and notoriously" acknowledged that N.T. was his child. (*Id.* at 24.) He had reportedly told his "family, friends" and "everybody" that he was N.T.'s father, and he would push N.T. in a stroller outdoors. (*Id.* at 25.) Plaintiff further testified that Thomas had come to her house several times per week. (*Id.*) According to Plaintiff, Thomas had given her clothes for N.T. and had provided financial support "all the time." (*Id.* at 24–25.) Plaintiff testified that the financial support paid by Thomas was not compelled by a court order, and she explained that the support had been paid in cash, rather than in checks, because Thomas's employer, a nightclub, had paid him in cash. (*Id.*) The ALJ did not ask Plaintiff any follow-up questions with respect to the amount, frequency, or duration of the support.

(*Id.*) Plaintiff testified that she had not saved any birthday cards or other correspondence in which Thomas had indicated that he was N.T.'s father. (*Id.* at 24–25, 28–29.)

Plaintiff's mother, Lillie Greene ("Greene") testified that she had known Thomas during his lifetime and that they had become "very good friends." (*Id.* at 44.) According to Greene, Thomas had acknowledged that he was N.T.'s father, and Thomas had brought gifts, including toys and diapers, for N.T. when he visited her. (*Id.* at 44–45.) She claimed that Thomas would hold N.T. as a baby and say "that's my baby" and "look at my little girl." (*Id.* at 44.)

Following Thomas's death, his family filed a lawsuit against the New Jersey Police Department. (*Id.* at 22–23.) As part of the lawsuit, Plaintiff and N.T., as well as several other children who were alleged to have been fathered by Mr. Thomas, were asked to supply blood specimens to be used in determining paternity. (*Id.*) According to Plaintiff, the testing took place approximately four months after the death of Mr. Thomas, at a DNA testing laboratory known as Lifecodes Corporation. (*Id.* at 23, 26.)

Plaintiff testified before the ALJ that Thomas's blood had been taken by police at the time of his death. (*Id.* at 25.) According to a chain of custody statement dated October 21, 1999, prepared by Michael Emanuel, a forensic scientist, and Janice R. Ratliff, both of the NJ State Toxicology Laboratory, Thomas's blood samples had been stored at that laboratory and were released to Micro Diagnostics on October 19, 1999. (*Id.* at 87.)[7] On November 1, 1999, Micro Diagnostics issued a

---

7. This Court notes that the address of Micro Diagnostics, listed on the Paternity Evaluation Report (R. 73), is identical to the address of Lifecodes Corporation, listed on the Clinical

Laboratory Permit (R. 88), and further notes that the facsimile sent from Lifecodes to Kim Gibbs, on January 16, 2001, purports to have originated from "LIFECODES/MICRO

paternity evaluation report indicating that Thomas could not be excluded as N.T.'s biological father. (*Id.* at 73.) According to the report, "the probability of paternity is 99.69% as compared to an untested random man." (*Id.*) The report was sworn to under oath, before a notary, by the director of Micro Diagnostics. (*Id.*) Plaintiff testified that the lawsuit for which this report was completed was ultimately discontinued. (*Id.* at 23.)

On January 3, 2000, Plaintiff filed a petition in New York State Family Court for a paternity order to establish that Thomas was the father of N.T. (*Id.* at 80–82.) [8] In the petition, Plaintiff claimed that she had sexual intercourse with Thomas on several occasions during a period of time beginning on or about November 1, 1995 and ending on or about June 1, 1998, and that, as a result of these relations, Plaintiff became pregnant and gave birth to N.T. (*Id.* at 80.) On March 31, 2000, the New York State Family Court entered an Order of Filiation declaring that Thomas was the father of N.T. (*Id.* at 78.) The Order of Filiation indicated that Thomas had failed to appear or otherwise answer the petition, despite having been properly served. (*Id.* at 78.) Given that Thomas was killed on June 6, 1999 (*id.* at 22, 70, 173), however, the statement that Thomas was served is apparently inaccurate.

On July 10, 2001, the New York City Department of Health issued Plaintiff a new birth certificate for N.T., naming Mr. Thomas as her father and changing her last name to [T]. (*Id.* at 103.)

As of July 13, 2001, the date of the first administrative hearing regarding Plain-tiff's application for Benefits, Plaintiff had not legally separated from her ex-husband Bonnett. (*Id.* at 17–18.)

Following the July 13, 2001 hearing before ALJ Scheer, Plaintiff submitted the following documents as supplemental evidence in support of her administrative appeal:

1. A notarized statement dated July 16, 2001 from Terry Pauls, who identified herself as Plaintiff's sister, stating that "Ronald Van Thomas acknowledged N.T. as his daughter." (*Id.* at 105.) In addition, the statement reports that Thomas "took care of [N.T.] financially and spent time with her on a weekly basis, and sometime[s] in [Ms. Pauls'] presence."

2. A notarized statement dated July 16, 2001 from Timothy Thomas, who identified himself as Thomas's brother, stating that "Ronald Van Thomas acknowledged [N.T.] as his daughter" and he "supported her financially, emotionally and morally."

3. A birthday card, dated December 17, 1997, which includes the inscription: "To daddy's little girl [N.T.,] Happy Birthday sweetheart enjoy your first birthday[.] Love your daddy Ronald[.] [H]ugs [and] kisses[.]"

(*Id.* at 44, 106, 107–08.)

## C. *Evidence From the Remand Proceedings*

During the supplemental hearing before ALJ Auslander, the ALJ asked Plaintiff

---

DIAG" (R. 86–88). The Court therefore assumes that, at the relevant time, Micro Diagnostics was an affiliate of Lifecodes Corporation. According to the Clinical Laboratory Permit, Lifecodes was authorized by the New York State Department of Health, at all relevant times, to perform paternity/identity testing, DNA testing, and HLA testing, in accor-dance with Article 5, Title V, Section 575 of the Public Health Law. (R. at 88.)

8. Although the Petition for Paternity is not dated, the Order of Filiation indicates that this petition was filed on January 3, 2000. (R. at 78.)

questions about certain photographs she submitted in evidence; these included several photographs of N.T. and several of Thomas, although none showed N.T. and Thomas together. (*See id.* at 138–42, 148, 164–72.) The ALJ did not ask Plaintiff any further questions, and Plaintiff offered no further testimony.

Following the February 24, 2005 hearing, Plaintiff submitted the following as supplemental evidence:

1. A statement dated April 18, 2002 from Marion C. Roston ("Roston"), who identified herself as Thomas's mother, stating that Roston "[had] known [Plaintiff] to be the mother of [her] son[']s child, [N.T.]," and that N.T. "[had] been a part of [her] family [since] she was born."[9]

2. A statement dated April 29, 2002 from Timothy Thomas, who identified himself as Thomas's brother, stating that N.T. was his niece and the daughter of Thomas. In his statement, Timothy Thomas reported that Thomas had supported N.T. "financially, emotionally, physically, and spiritually." (*Id.*) Further, according to Timothy Thomas, "Ronald Van Thomas orally admitted to [him] that [N.T.] is his daughter." (*Id.*)

3. A thank-you note by Roston, dated February 8, 2005, thanking N.T. for a gift and acknowledging herself as N.T.'s "grand mommy." The card reads: "Thank you so much for my lovely gift. The gift, the card and the gift wrapping was lovely. Grand mommy loves you very much. I'm looking forward to seeing you this summer. Stay as sweet as you are. Love, Grand mommy."

4. Thomas's funeral service program and obituary dated June 11, 1999, prepared by his family. Under the list of surviving children, N.T. is apparently listed, although her name is spelled incorrectly.

(*Id.* at 146, 147, 163, 174.)

### D. ALJ Auslander's Findings

After considering the evidence of record, including the testimony at the hearing before him, ALJ Auslander concluded that N.T. was not entitled to Benefits. (*Id.* at 121.) The ALJ based this conclusion upon his determination that the evidence in the case did not show that N.T. was the child of the deceased wage earner, Thomas. (*Id.*) As Petitioner and Thomas were both residents of the State of New York at the time of Thomas's death and the birth of N.T., the ALJ applied New York State intestacy law. (*Id.* at 122.) Based on the evidence submitted by Plaintiff, the ALJ found, *inter alia*, that Thomas and Plaintiff "never cohabited or otherwise shared a domicile"; that Thomas "did not provide financial support to [N.T.]"; that Thomas "did not acknowledge [N.T.] as his child"; that Plaintiff "was married to another individual who was not [Thomas] at the time that [N.T.] was conceived and was born"; that "[t]he genetic testing was not carried out in accordance with the law of the State of New York"; and that "[t]he evidence of record [did] not establish that [N.T. was] the 'child' of the deceased wage earner as required by the Social Security Act." (*Id.* at 125.)

Based on these findings, the ALJ determined that N.T. was not entitled to Benefits. (*Id.* at 126.)

---

**9.** Roston reportedly understood N.T. to be her grandchild and stated that her children considered N.T. to be their niece. (*Id.* at 147.)

## DISCUSSION

### I. APPLICABLE LEGAL STANDARDS

#### A. Standard of Review

 Pursuant to the Act, the findings of the Commissioner as to any fact, "if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *see Howell v. Barnhart*, 265 F.Supp.2d 268, 270 (S.D.N.Y.2003). Substantial evidence has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotations and citation omitted). Thus, where the Court finds that substantial evidence exists to support the ALJ's determination, the decision will be upheld, even if contrary evidence exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir.1990); *DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (decision affirmed where there was substantial evidence for both sides). This standard applies to findings of fact, as well as to inferences and conclusions drawn from such facts. *See Levine v. Gardner*, 360 F.2d 727, 730 (2d Cir.1966); *D'Amato v. Apfel*, No. 00 Civ. 3048(JSM), 2001 WL 776945, at *1, 2001 U.S. Dist. LEXIS 9459, at *3 (S.D.N.Y. July 10, 2001).

 An ALJ's findings as to the credibility of witnesses are entitled to deference. *Bomeisl v. Apfel*, No. 96 Civ. 9718(MBM), 1998 WL 430547, at *6, 1998 U.S. Dist. LEXIS 11595, at *19 (S.D.N.Y. July 28, 1998) (deferring to the ALJ's credibility determinations "because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing"). Where an ALJ discredits a witness's testimony, however, the ALJ must state explicitly his reasons for doing so with sufficient specificity to enable a reviewing court to determine the legitima-cy of those reasons and whether the determination is supported by substantial evidence. *Martone v. Apfel*, 70 F.Supp.2d 145, 151 (N.D.N.Y.1999) (citing *Brandon v. Bowen*, 666 F.Supp. 604, 608 (S.D.N.Y. 1987)).

 In addition to reviewing an ALJ's decision to determine whether it has sufficient evidentiary support, the Court must also review the decision to determine whether the ALJ applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.1999). " 'Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.' " *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir.1984) (quoting *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n. 3 (11th Cir.1982)). Thus, the Court reviews *de novo* whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles. *See id.*; *see also Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987).

#### B. Statutory Standard for Entitlement to Surviving Child's Insurance Benefits

The Act provides, in relevant part, that the child of a deceased wage earner is entitled to Social Security benefit payments if the child is unmarried, under the age of 18, and was dependent on the wage earner at the time of his or her death. 42 U.S.C. § 402(d)(1)(2006); *see Howell*, 265 F.Supp.2d at 270–71. An applicant is deemed to be the "child" of a wage earner for purposes of the Act if (1) the applicant would inherit the insured's personal property as his or her child under the intestacy laws of the state in which the wage earner was domiciled at the time of death; or (2)

the applicant satisfies one or more of several alternate tests provided under the Act. 42 U.S.C. § 416(h)(2)(A)-(3)(C)(2006). A child is deemed to be "dependent" on a wage earner if (1) at the time of death, the wage earner was living with or "contributing to the support of" such child, 42 U.S.C. § 402(d)(3), or (2) if such child is the "natural child" of the wage earner. 20 C.F.R. § 404.361(a) (2008). The definition of "natural child" under the Regulations includes, *inter alia,* a child who would "inherit the insured's personal property as his or her child" under state intestacy laws. 20 C.F.R. § 404.355(a)(1), (b) (2008).

## II. *REVIEW OF THE ALJ'S DECISION*

### A. *The ALJ's Determination As To Whether N.T. Was Thomas's "Child"*

As set forth above, the ALJ was first required to determine whether N.T. was the "child" of Thomas (1) so as to be eligible to inherit from Thomas under the relevant state intestacy law, or (2) under the alternative tests set forth in the Act.

#### 1. *New York Intestacy Law*

▮ As Thomas was domiciled in New York at the time of his death, New York intestacy law applies in this case. (R. at 52, 70, 121; *see also* 42 U.S.C. § 416(h)(2)(A).) Under New York law, a non-marital child can inherit from her father if: (a) a court of competent jurisdiction has, during the lifetime of the father, made an order of filiation declaring paternity or the mother and father of the child have executed an acknowledgment of paternity; (b) the father of the child has signed a notarized and witnessed instrument acknowledging paternity; (c) paternity has been established by clear and convincing evidence and the father of the child has openly and notoriously acknowledged the child as his own; or (d) a blood genetic marker test had been administered to the father which together with other evidence establishes paternity by clear and convincing evidence. *See* N.Y. Est. Powers & Trusts Law § 4–1.2(a)(2) (McKinney 1998); *see also Howell,* 265 F.Supp.2d at 270–71.

Here, while the first, second, and fourth of these tests have not been satisfied by the evidence of record, the evidence presented to the ALJ was more than sufficient to satisfy the third test, as a matter of law. Each of the tests is addressed, in order, below.

#### a. *Although the Record Contains a Court Order of Filiation, the ALJ Acted Properly in Disregarding It.*

First, under N.Y. Est. Powers & Trusts Law § 4–1.2(a)(2)(A), paternity for purposes of inheritance can be established by evidence that a court of competent jurisdiction has, during the lifetime of the father, made an order of filiation declaring paternity or the mother and father of the child has executed an acknowledgment of paternity.

In this case, the record did contain an Order of Filiation, issued by the Family Court for the County of Bronx on March 31, 2000. (R. at 78–82, 122.) The ALJ rejected this Order as a basis for finding N.T. entitled to Benefits, noting that, despite the fact that the Order recited that it had been issued following proper service on Thomas, Thomas had, in fact, been deceased for almost six months prior to the filing of the petition seeking the Order. (*Id.* at 122.)

As New York intestacy law requires that such an Order have been issued prior to the death of the alleged father, the ALJ's decision to disregard the Order was proper. *See* N.Y. Est. Powers & Trusts Law § 4–1.2(a)(2)(A); *see Lalli v. Lalli,* 439 U.S. 259, 275–76, 99 S.Ct. 518, 58 L.Ed.2d

503 (1978) (with respect to the fairness of imposing a pre-death Order of Filiation requirement to prove paternity, finding that "the requirement imposed by § 4–1.2 on illegitimate children who would inherit from their fathers is substantially related to the important state interests the statute is intended to promote").

### b. There Is No Evidence That Thomas Signed a Notarized and Witnessed Instrument Acknowledging Paternity.

Second, under N.Y. Est. Powers & Trusts Law § 4–1.2(a)(2)(B), N.T.'s right to inherit from Thomas could have been established by evidence that Thomas had executed a witnessed and notarized statement acknowledging paternity. There is, however, no such evidence in the administrative record.

### c. The Record Does Contain Clear and Convincing Evidence of Paternity, and that Thomas Openly and Notoriously Acknowledged N.T. as His Child.

Third, under N.Y. Est. Powers & Trusts Law § 4–1.2(a)(2)(C), N.T. could have shown that she was entitled to inherit from Thomas by (i) establishing Thomas's paternity by clear and convincing evidence, and (ii) showing Thomas had openly and notoriously acknowledged her as his child. As to this provision, the ALJ erred, as a matter of law, in his application of the statute to the evidence before him.

### i. The ALJ Erred by Failing To Find That the DNA Test Result Was "Clear and Convincing Evidence" of Thomas's Paternity.

The ALJ discounted the DNA evidence in this case based on what he stated was the "well-established principal of law in the State of New York that, in order for a genetic marker or DNA test to be valid, it must have been performed during the lifetime of the father," and because he found the chain of custody of the DNA evidence to have been insufficient. (R. at 124.) The ALJ's understanding of the law in this area was mistaken.

The Social Security Administration Appeals Council addressed the issue of posthumous DNA testing during its consideration of Plaintiff's request for review. (Id. at 111.) The Appeals Council "observe[d] that New York State law does *not* prohibit posthumous testing and has recognized such test results as clear and convincing evidence of paternity under N.Y. C.L.S. E.P.T.L. § 4–1.2(a)(2)(C)." (Id. (emphasis added).) Indeed, Defendant now concedes this point. (*See* Memorandum of Law in Support of Defendant's Motion For Judgment on the Pleadings, dated Sept. 21, 2007 ("Def. Mem.") (Dkt. 15), at 10.)

Numerous surrogate's courts and both of the two Appellate Divisions of the New York Supreme Court to consider the issue directly have held that the "clear and convincing evidence" prong of Section 4–1.2(a)(2)(C) may be satisfied by means of posthumous DNA testing. See In re Poldrugovaz, 50 A.D.3d 117, 851 N.Y.S.2d 254 (2d Dep't 2008) (citing numerous surrogate's court cases); In re Estate of Morningstar, 17 A.D.3d 1060, 794 N.Y.S.2d 205 (4th Dep't 2005).[10] Contrary to the ALJ's understanding, neither Section 4–1.2(a)(2)(C), nor the case law interpreting it, contains a requirement that DNA testing must have been performed prior to the death of the father for purposes of satisfy-

---

**10.** New York law on this point has evolved since the time of Thomas's death, becoming more favorable to Petitioner. The Regulations dictate that the law that should be applied is the more favorable of either the law in place at the time of the wage earner's death or the law in place at the time the Commissioner's decision became final, which, in this case, was March 20, 2007. (20 CFR § 404.355(b)(4); R. at 111–12.)

ing this Section.[11] *See Poldrugovaz*, 851 N.Y.S.2d at 265 (affirming the lower court's grant of a pretrial order for posthumous genetic marker testing of a deceased man whose alleged child wanted to prove paternity for inheritance rights); *In re Michael R.*, 7 Misc.3d 250, 793 N.Y.S.2d 710, 711 (N.Y.Sur.Ct.2004) (finding that "[c]ourts have accepted posthumously obtained DNA test results as clear and convincing evidence of paternity pursuant to E.P.T.L. 4–1.2(a)(2)(C)"); *In re Estate of Thayer*, 1 Misc.3d 791, 769 N.Y.S.2d 863 (N.Y.Sur.Ct.2003) (finding that blood collected shortly after the decedent's death in a automobile accident and subsequent DNA "test result of 99.98% [was] more than sufficient to constitute clear and convincing evidence of paternity"); *Matter of Santos*, 196 Misc.2d 972, 768 N.Y.S.2d 272, 274 (N.Y.Sur.Ct.2003) (allowing posthumously gathered DNA to establish paternity and noting that "[t]he state of technology for DNA testing post-E.P.T.L. 4–1.2 has advanced to the point that it can determine paternity to a 99–100 percent scientifically acceptable certainty, clearly meeting a 'clear and convincing' standard"); *In re Bonanno*, 192 Misc.2d 86, 745 N.Y.S.2d 813, 815 (N.Y.Sur.Ct.2002) ("There is no basis in law or logic to exclude the results of posthumously conducted DNA tests on a decedent's genetic material from the category of 'clear and convincing' evidence under E.P.T.L. 4–1.2(a)(2)(C). This is particularly true where the material is available without the drastic remedy of exhumation, comes from a reliable source, and is amenable to accurate testing."). The ALJ therefore erred in his application of New York intestacy law by failing to consider Plaintiff's posthumously performed DNA test as evidence of paternity under § 4–1.2(a)(2)(C).

■ The ALJ was further troubled by the evidentiary foundation of the DNA test. In particular, he noted that the letter from the New Jersey Department of Toxicology did not address the chain of custody of Thomas's blood sample prior to the transfer of the sample from the Department to Micro Diagnostics. (R. at 124.) The ALJ also indicated that there was no chain of custody for the samples allegedly provided by Plaintiff and N.T. (*Id.*) The ALJ's analysis in this regard was also flawed, as, under New York law, records of DNA tests certified by the head of a qualified laboratory and performed pursuant to the Family Court Act or the Social Services Law are presumed to be admissible in evidence and do not require

---

**11.** The same cannot be said of Section 4–1.2(a)(2)(D), under which DNA testing must have been performed during the life of the father. This distinction may have been the source of the ALJ's confusion. Section 4–1.2(a)(2)(D) provides that paternity is established where "a blood genetic marker test *had* been administered to the father which together with other evidence establishes paternity by clear and convincing evidence." N.Y. Est. Powers & Trusts Law § 4–1.2(a)(2)(D) (McKinney 1998) (emphasis added). Courts construe the provision, and specifically the word "had," to mean that such a blood genetic marker test or DNA test must have been completed prior to the death of the alleged father. *See In re Estate of Sekanic*, 271 A.D.2d 802, 705 N.Y.S.2d 734 (3d Dep't

2000); *In re Estate of Janis*, 210 A.D.2d 101, 101, 620 N.Y.S.2d 342 (1st Dep't 1994). The posture of these cases was such that the courts were asked to compel exhumation of the decedent's body, which was a significant factor in their holdings. *Id.* Where DNA evidence can be obtained without exhumation, however, the prohibition against posthumous genetic testing under § 4–1.2(a)(2)(D) has been less clearly established. *See, e.g., In re Estate of Wilkins*, 184 Misc.2d 218, 221, 707 N.Y.S.2d 774 (N.Y.Sur.Ct.2000) ("The court finds that the use of preexisting blood genetic marker tests and/or blood samples meets the statutory requirement of the first prong of EPTL 4–1.2(a)(2)(D), which requires blood genetic marker testing on the putative father prior to his death.").

any further foundational basis. N.Y. C.P.L.R. § 4518(d)-(e) (McKinney 2008); *Commissioner of Soc. Servs. v. Dennis,* 250 A.D.2d 424, 673 N.Y.S.2d 5 (1st Dep't 1998); *Beaudoin v. David R.R.,* 152 A.D.2d 776, 543 N.Y.S.2d 557 (3d Dep't 1989); *Clovsky v. Stanley "VV,",* 176 A.D.2d 419, 574 N.Y.S.2d 304 (3d Dep't 1991). The DNA test submitted by Plaintiff was certified by the director of Micro Diagnostics (R. at 73), a laboratory authorized by the New York State Department of Health to perform such testing (*id.* at 88), and, based on the record, the testing was conducted in connection with a court proceeding in which it was necessary to establish Thomas's paternity of N.T. (*id.* at 22–23, 26).

Defendant argues that the presumption of admissibility under New York law applies only to DNA tests conducted by order of a court. (Def. Mem. at 10–11.) Yet only one of the cases cited by Defendant directly supports this proposition, *see Barbara Ann W. v. David Wy,* 183 Misc.2d 228, 701 N.Y.S.2d 845 (N.Y.Fam.Ct.1999) (cited in Def. Mem. at 11), and the vast weight of New York case law supports the opposite proposition, *i.e.,* that properly certified DNA tests are admissible whether or not conducted by order of a court, *see Westchester County Dep't of Social Servs. ex rel. Rosa B. v. Jose C.,* 204 A.D.2d 795, 611 N.Y.S.2d 704, 706 (3d Dep't 1994) ("Without merit is respondent's argument that [the father's blood] test results should not have been admitted into evidence because it was not court ordered and proof of the chain of command was not properly established ...; the test was properly certified ... and no other foundational requirements were necessary.") (citations omitted); *Barbara A. v. Gerard J.,* 146 Misc.2d 1001, 553 N.Y.S.2d 638, 640 (N.Y.Fam.Ct.1990) (noting that "New York law does not prohibit the admission of DNA testing into evidence in

civil matters simply because the testing was not conducted under court order") (citations omitted), *aff'd,* 178 A.D.2d 412, 577 N.Y.S.2d 110 (2d Dep't 1991); *Lory v. Lory,* 119 Misc.2d 205, 462 N.Y.S.2d 744, 747 (N.Y.Sup.Ct.1983) ("The court is of the opinion that merely because the [blood] test was not administered pursuant to court direction ... would not per se void its admission into evidence under C.P.L.R. 4518. This court knows of no rule which excludes the results of [a blood] test simply because the test was not ordered by a court.") (citations omitted); *see also Dennis,* 673 N.Y.S.2d 5 (test results were certified in accordance with C.P.L.R. 4518 and no other foundational requirements were necessary); *Beaudoin,* 543 N.Y.S.2d 557 (same); *Clovsky,* 574 N.Y.S.2d 304 (same). Based on this authority, the ALJ erred to the extent he discounted the DNA test results on the ground that the test was not court-ordered.

 Even if Plaintiff had been required under New York law to show a foundational basis for the DNA evidence, defects in the chain of custody should not have led the ALJ to disregard the evidence under the circumstances. Where reasonable assurances of the evidence's identity and unchanged condition exist, chain of custody defects affect only the weight of the evidence and not its admissibility. *See People v. Watkins,* 17 A.D.3d 1083, 793 N.Y.S.2d 657, 658 (4th Dep't 2005).

Defendant relies chiefly on *Brian B. v. Dionne B.,* 267 A.D.2d 188, 699 N.Y.S.2d 491, 492 (2d Dep't 1999), for his assertion that the ALJ "correctly declined to accept [DNA] testing as clear and convincing evidence of paternity." (Def. Mem. at 11.) In *Brian B.,* however, the court refused to look at the results of a DNA test in determining paternity where the specimens of

all parties involved in testing were personally delivered by the petitioner, suggesting foul play on her part. *See Brian B.*, 699 N.Y.S.2d at 492; *see also Barbara A.M.*, 577 N.Y.S.2d 110 (same). In this case, no such assertions of foul play are made by either Defendant or the ALJ. Thomas's blood sample was collected by the New Jersey Police, and the only unaccounted-for link in the chain of custody was the transfer from the New Jersey Police to the New Jersey State Department Toxicology. (R. at 87.) Moreover, it is unlikely that Plaintiff would have been involved in this transfer. Plaintiff and N.T.'s own DNA samples were collected at the state certified laboratory, rather than being delivered there by Plaintiff. (*Id.* at 26; *cf. Brian B.*, 699 N.Y.S.2d at 492.) Again, under the circumstances, it is unlikely that Plaintiff or anyone with an interest in this case would have had the opportunity to tamper with the samples. *See also People v. Porter*, 46 A.D.2d 307, 362 N.Y.S.2d 249 (3d Dep't 1974) (admitting evidence of blood test where the only period unaccounted for was the period between the delivery of the sample to the chemist and his analysis of it).

Finally, Defendant improperly relies on *In re Glass v. David*, 230 A.D.2d 855, 646 N.Y.S.2d 706 (2d Dep't 1996), in support of the ALJ's conclusions with respect to the DNA test. (Def. Mem. at 11.) In *Glass*, the court affirmed the lower court's exclusion of a DNA test where the plaintiff "failed to lay a proper foundation that the testing was done by a duly-approved laboratory or that [such testing was] relevant." *Glass*, 646 N.Y.S.2d at 707. In this case, the DNA testing was done by a duly approved laboratory and the results are clearly relevant.

In sum, the ALJ erred as a matter of law in failing to consider the DNA test results as evidence of paternity, and—given the strength of those results—in failing to find that the DNA test was "clear and convincing evidence" of paternity under Section 4–1.2(a)(2)(C). *See Commissioner of Soc. Servs. v. Ernest HH*, 195 A.D.2d 738, 600 N.Y.S.2d 332, 334 (3d Dep't 1993) (finding paternity "extremely likely" based upon DNA test results indicating a more than 99% probability of paternity, in spite of contradictory evidence on the record).

**ii. The ALJ's Determination That Thomas Did Not "Openly and Notoriously" Acknowledge N.T. as His Child Was Not Based on Substantial Evidence.**

Under Section 4–1.2(a)(2)(C), in addition to establishing clear and convincing evidence of paternity, Plaintiff must also demonstrate that Thomas "openly and notoriously" acknowledged N.T. as his child. N.Y. Est. Powers & Trusts Law § 4–1.2(a)(2)(C).

While the establishment of paternity must be shown by "clear and convincing" evidence, no such standard of proof is needed in evaluating whether the alleged father "openly and notoriously" acknowledged the child as his own. *Poldrugovaz*, 851 N.Y.S.2d at 262 ("Indeed, a literal reading of the statute reveals that the 'clear and convincing' standard modifies only the phrase 'proof of paternity' and the phrase 'the father of the child has openly and notoriously acknowledged the child as his own' is not modified by any standard of proof."). Further, there is no requirement that the father's open acknowledgment of the child be universal. *See In re Davis*, 27 A.D.3d 124, 812 N.Y.S.2d 543, 546 (2d Dep't 2006) ("To establish an open and notorious acknowledgment of paternity, there is no requirement that the putative father disclose paternity to all his friends and relatives. An acknowledgment of paternity in the community in which the child lives is sufficient.") (citing *Matter of Anne*

*R. v. Estate of Francis C.*, 234 A.D.2d 375, 651 N.Y.S.2d 539 (2d Dep't 1996)); *In re Estate of Francis*, 9 Misc.3d 743, 803 N.Y.S.2d 380 (N.Y.Sur.Ct.2005) ("[T]he decedent's acknowledgment of the children as his own to both the petitioner's mother and sister satisfies the statutory requirement that he openly and notoriously acknowledge the children as his own."). There is also no requirement in the text of § 4–1.2(a)(2)(C) or in the applicable case law that the acknowledgment be made in writing. *Id.*; § 4–1.2(a)(2)(C). Rather, proof of acknowledgment can be shown by oral declarations, a paper trail of documents, or acts from which the acknowledgment can be logically inferred. *Id.*

Here, the ALJ found that Thomas had not acknowledged N.T. as his child. (R. at 125.) With respect to the birthday card allegedly written from Thomas to N.T., the ALJ concluded "that it has not been established that it was prepared by [Thomas]." (*Id.* at 124.) Similarly, the ALJ found that the letters asserting that Thomas had acknowledged N.T. as his own "cannot be given significant weight as these individuals did not know the name of the child at the time his obituary was prepared." (*Id.*) The ALJ did not consider the testimony of Plaintiff or Plaintiff's mother, both of whom testified that Thomas had openly acknowledged N.T. as his daughter.

The ALJ did not explain in the body of his decision why he omitted from consideration testimony by Plaintiff and Plaintiff's mother of Thomas's open acknowledgment. During the hearing, however, the ALJ interrupted Plaintiff's mother as she was testifying on this issue and said, "the problem that I have, again, is that the statute, the law of New York says acknowledgment in writing." Apparently, the ALJ was conflating § 4–1.2(a)(2)(B), which provides for proof of paternity by a signed and notarized written acknowledgment, and § 4–1.2(a)(2)(C). If this mistaken application of law contributed to the ALJ's decision not to consider the testimony of open and notorious acknowledgment, then the decision was clearly reached in error. § 4–1.2(a)(2)(C); 2–32 *Warren's Heaton on Surrogate's Court Practice* § 32.15.

Moreover, the ALJ's findings with respect to the notarized statements submitted by Thomas's brother Timothy Thomas, Thomas's mother Marion C. Roston, and Plaintiff's sister Terry Pauls, are not supported by substantial evidence. The ALJ drew from the fact that N.T.'s first name was misspelled on Thomas's obituary the inference that "these individuals did not know the name of the child." (*Id.* at 124.) There is no evidence in the record, however, that any of the individuals who wrote the notarized statements prepared the obituary or had any role in the spelling of N.T.'s name therein. The fact of the misspelling, therefore, does not substantially support the inference that the individual or individuals who wrote the obituary did not know the spelling N.T.'s name or the name itself, nor does it support the further inferential step that Thomas did not openly and notoriously acknowledge N.T. If anything, these notarized statements constitute evidence in support of the opposite conclusion, that Thomas openly and notoriously acknowledged N.T. as his child. *See Francis*, 803 N.Y.S.2d 380.

The ALJ further found that Plaintiff fabricated the birthday card that she alleged was prepared by Thomas for N.T. (R. at 124.) In reaching this conclusion, the ALJ noted that the card contained identifying information that was helpful to Plaintiff's claim, a fact which he found to be discrediting. In addition, the ALJ took administrative notice that New York University, which Thomas had attended on full scholarship, is a prestigious university that does not award athletic scholarships. The

ALJ apparently inferred from these facts that Thomas was likely to have had neat handwriting and, observing that the writing on the birthday card was "rather crude in nature," the ALJ concluded that Thomas did not prepare the card. *Id.* Although this Court finds this line of reasoning somewhat dubious, an ALJ's credibility determinations are entitled to deference. *Bomeisl,* 1998 WL 430547, at *6, 1998 U.S. Dist. LEXIS 11595, at *19. Although this Court accepts the ALJ's finding that Plaintiff fabricated the birthday card, the fact of the fabricated birthday card does not constitute substantial evidence that Thomas did not openly and notorious acknowledge N.T., particularly in light of the countervailing evidence, which includes statements from Thomas's own family members. *See Francis,* 803 N.Y.S.2d 380.

### d. *Evidence of a Posthumous DNA Test Is Insufficient To Satisfy the Fourth Test.*

As the evidence before the ALJ demonstrated that the third test, above, was satisfied, the Court need not consider whether N.T. demonstrated the right to inherit from Thomas under the fourth available test, which is set out in N.Y. Est. Powers & Trusts Law § 4–1.2(a)(2)(D). The Court notes, however, that this section *would* have required that the DNA testing be completed during Thomas's lifetime. (*See supra,* at n. 11.) As DNA testing of the putative father was performed posthumously in this case, this section is inapplicable.

### 2. *Statutory Alternatives To the Application of State Intestacy Law*

As set out above, if an applicant cannot satisfy the requirements necessary to inherit from the wage earner under the relevant state's intestacy law, the applicant may still qualify as a "child" of the wage earner, for purposes of a benefits determination, by following any of several alternative routes provided by the Act. *See* 42 U.S.C. § 416(h)(2)(B); 42 U.S.C. § 416(h)(3)(C). Specifically, these provisions designate the applicant as the child of the wage earner if (i) the mother or father of the applicant and the wage earner "went through a marriage ceremony resulting in a purported marriage between them" (42 U.S.C. § 416(h)(2)(B)); (ii) the wage earner "had acknowledged in writing that the applicant is his or her son or daughter," before his death (42 U.S.C. § 416(h)(3)(C)(i)(I)); (iii) the wage earner "had been decreed by a court to be the mother or father of the applicant," before his death (42 U.S.C. § 416(h)(3)(C)(i)(II)); (iv) the wage earner "had been ordered by a court to contribute to the support of the applicant," before his death (42 U.S.C. § 416(h)(3)(C)(i)(III)); or (v) the applicant has "shown by evidence satisfactory to the Commissioner of Social Security to have been the mother or father of the applicant, and such insured individual was living with or contributing to the support of the applicant at the time such insured individual died" (42 U.S.C. § 416(h)(3)(C)(ii)).

Given that Plaintiff has shown that, based on the evidence before the ALJ, N.T. satisfies the requirements for inheritance under New York intestacy law, there is no need for this Court to consider these alternative routes. Nonetheless, the Court notes that the ALJ correctly rejected their applicability in this case, for the following reasons:

### a. *N.T.'s Mother and Thomas Were Not Married.*

Under 42 U.S.C. § 416(h)(2)(B), an applicant is determined to be the child of the wage earner if the wage earner "went through a marriage ceremony resulting in a purported marriage" with the mother or father of the child applicant. This is not alleged in this case, and there is no evi-

dence in the record suggesting that N.T.'s Mother and Thomas were ever married.

### b. The ALJ's Finding That Thomas Had Not Acknowledged N.T. in Writing as His Child Was Based on a Credibility Assessment of the Witnesses, and Should Be Given Deference.

Under 42 U.S.C. § 416(h)(3)(C)(i)(I), an applicant is determined to be the child of the wage earner if the wage earner "had acknowledged in writing that the applicant is his or her son or daughter," before his death. The only evidence in the record relevant to this provision is the birthday card allegedly prepared by Thomas for N.T., which the ALJ discredited as unreliable. *Bomeisl*, 1998 WL 430547, at *6, 1998 U.S. Dist. LEXIS 11595, at *19. The ALJ reasoned that because Plaintiff had testified at the first hearing that no birthday cards from Thomas had been kept, and because, *inter alia*, the card subsequently produced contained more identifying information than a genuine birthday card would be expected to contain, the card was not credible evidence. (R. at 124.) The ALJ adequately stated his reasons for discrediting the card, and the Court should thus defers to his determination in that regard.

### c. There Is No Evidence in the Record That Any Court Had Decreed Thomas To Be N.T.'s Father.

Under 42 U.S.C. § 416(h)(3)(C)(i)(II), an applicant is determined to be the child of the wage earner if the wage earner "had been decreed by a court to be the mother or father of the applicant," before his death. As discussed above, the ALJ properly discounted the Order of Filiation presented in this case because it was not decreed by a court before Thomas's death.

### d. The Record Does Not Reflect That Any Court Had Ordered Thomas To Contribute To N.T.'s Support.

Under 42 U.S.C. § 416(h)(3)(C)(i)(III), an applicant is determined to be the child of the wage earner if the wage earner "had been ordered by a court to contribute to the support of the applicant," before his death. This has been neither alleged, nor demonstrated.

### e. Substantial Evidence Supports the ALJ's Determination That Thomas Was Neither Living With N.T., nor Contributing to Her Support, at the Time of His Death.

Finally, under 42 U.S.C. § 416(h)(3)(C)(ii), an applicant is determined to be the "child" of a wage earner if the wage earner has been "shown by evidence satisfactory to the Commissioner of Social Security to have been the mother or father of the applicant, and such insured individual was living with or contributing to the support of the applicant at the time such insured individual died." The Regulations require that "[c]ontributions must be made regularly and must be large enough to meet an important part of [the claimants's] ordinary living costs." 20 C.F.R. § 404.366 (McKinney 1998). The claimant carries the burden of producing evidence of contribution, 20 CFR § 404.704 (McKinney 1998), which can be satisfied by receipts, credible and detailed testimony, bank account records, or "[a] signed statement by someone in a position to know ... showing what contributions the insured made to your support and when and how they were made." 20 C.F.R. § 404.736 (McKinney 1998). The ALJ found that Thomas did not contribute financial support to N.T. (R. at 124.) This finding is supported by substantial evidence.

Plaintiff testified that Thomas had provided cash and clothes to N.T. (*Id.* at 24–

25.) She speculated that the reason Thomas gave her cash rather than checks was that he worked as a bouncer at a nightclub, a fact supported by the record (*id.* at 173), and that he was paid in cash (*id.* at 24). She did not testify as to the amount, frequency, or duration of the contributions except to say that Thomas contributed "all the time." (*Id.*)

The ALJ found that Thomas's testimony lacked credibility, and he provided several reasons for his determination. (R. at 124.) First, the ALJ noted that, although Plaintiff testified that her name was Kim Thomas, Plaintiff was still married to John Bonnett and had provided no document establishing a name change. (*Id.*) Second, the ALJ noted that Plaintiff had originally testified at the first hearing that no birthday cards had been kept, but then subsequently produced one of "doubtful" authenticity. (*Id.*) Third, with respect to the Order of Filiation, the ALJ noted that Plaintiff claimed that Thomas had been properly served despite having been deceased for several months before the petition was filed. (*Id.* at 124–25.) These stated reasons, while not relating directly to Plaintiff's testimony regarding Thomas's financial support of N.T., nonetheless provide an adequate basis for the ALJ's conclusion that Plaintiff's testimony was generally unreliable.

Further, while the ALJ offered no explanation for declining to consider the other evidence of Thomas's contributions of support to N.T., the ALJ's decision should not be rejected on that ground. Plaintiff's mother testified that Thomas brought gifts to N.T., including toys and diapers (*id.* at 44); Thomas's brother, Timothy Thomas, provided two notarized statements indicating that Thomas had financially supported N.T (*id.* at 106, 146), and Plaintiff's sister provided a notarized statement in which she stated that Thomas "took care of [N.T.] financially and spent time with her on a weekly basis, and sometime[s] in my presence" (*id.* at 105). None of these additional statements, however, made any reference to the amount, frequency, or duration of the purported contributions, and the statements generally failed to demonstrate the witnesses' personal knowledge of the contributions described. Overall, there was a paucity of evidence in the record to show that Thomas had supported N.T., to the extent necessary to satisfy Plaintiff's burden under 42 U.S.C. § 416(h)(3)(C)(ii). Accordingly, the ALJ's finding that Thomas did not sufficiently contribute to N.T.'s support should be upheld.[12]

**B. The ALJ's Determination Regarding Whether N.T. Was Thomas's "Dependent"**

In addition to being determined under the Act to be the "child" of the wage earner, a child must also have been "dependent" on the wage earner at the time of death in order to be eligible for Benefits. 42 U.S.C. § 402(d)(1); *see Howell,* 265 F.Supp.2d at 270–71.

A child is deemed to be "dependent" on a wage earner if (1) at the time of death, the wage earner was living with or "con-

---

12. The Court notes that, upon remand, the Appeals Council directed the ALJ to evaluate the record regarding the amount and regularity of Thomas's financial support of N.T., and, if the ALJ were to find the evidence insufficient to support a finding of adequate financial support, to explain his reasoning in detail. The ALJ failed to do this, but, in light of the meager affidavits provided by Plaintiff on the issue and this Court's finding that Plaintiff, in any event, would be entitled to Benefits on other grounds, the Court does not recommend remand for the purpose of further investigation or explanation on the issue of financial support.

tributing to the support of" such child, 42 U.S.C. § 402(d)(3), or (2) if such child is the "natural child" of the wage earner. 20 C.F.R. § 404.361(a). The definition of "natural child" under the Regulations includes a child who would "inherit the insured's personal property as his or her child" under state inheritance laws. 20 C.F.R. § 404.355(a)(1), (b).

As discussed above, the record supports the ALJ's determination that Thomas did not contribute to N.T.'s support. Nonetheless, as this Court has already determined, the evidence presented to the ALJ showed that ALJ had a right to inherit from Thomas under the New York intestacy law. Thus, N.T. is properly considered a "natural child," pursuant to the pertinent regulations, and need show nothing further to demonstrate eligibility for Benefits. *See* 20 C.F.R. §§ 404.355(a)(1), 355(b), 361(a). In other words, a child who is unmarried, is under the age of 18, and would inherit the insured's personal property as his child under state intestacy law is entitled to the surviving child's insurance benefits under the Act without regard to whether the father lived with or contributed to the support of the child. *See Teschner v. Comm'r of Soc. Sec.*, 382 F.Supp.2d 662 (D.N.J.2005) (reversing and ordering payment of benefits where child was eligible to inherit under state intestacy law even though no showing had been made that the father lived with her or contributed to her support); *Donaldson v. Secretary of Health & Human Services*, 567 F.Supp. 166 (W.D.N.Y.1983) (same).

Accordingly, as a matter of law, the evidence that was before the ALJ establishes that N.T. is entitled to Benefits. As the decision of the Commissioner was based on legal error and is not supported by substantial evidence, it should be reversed.

## *CONCLUSION*

For the forgoing reasons, I respectfully recommend that Defendant's motion for judgment on the pleadings be denied, the decision of the Commissioner be reversed, and the case be remanded to the Commissioner for the calculation and awarding of Benefits.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Kimba M. Wood, United States Courthouse, 500 Pearl Street, Room 1610, New York, N.Y. 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, N.Y. 10007. Any requests for an extension of time for filing objections must be directed to Judge Wood. FAILURE TO OBJECT WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir.1983).